COURT OF APPEALS
DECISION
DATED AND FILED

July 8, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP1069-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2018CF13

IN COURT OF APPEALS
DISTRICT IV

STATE OF WISCONSIN,

　　PLAINTIFF-RESPONDENT,

　V.

BRIAN W. POUZAR,

　　DEFENDANT-APPELLANT.

　　　　　APPEAL from a judgment and an order of the circuit court for Dane County: WILLIAM E. HANRAHAN and MARIO WHITE, Judges. *Affirmed*.

　　　　　Before Blanchard, P.J., Kloppenburg, and Nashold, JJ.

　　　　　**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Brian W. Pouzar appeals a judgment of conviction and an order denying his postconviction motion for a new trial.[1] Pouzar seeks a new trial in the interest of justice on the ground that the real controversy was not fully tried. For the reasons set forth below, we conclude that a new trial in the interest of justice is not warranted. We affirm.

¶2 Pouzar was charged with two counts of repeated sexual assault of the same child and two counts of incest with a child as to two child victims, A.B. and C.D.[2] In a recorded interview that was played for the jury, C.D. testified that Pouzar sexually assaulted her multiple times at her grandfather's house when Pouzar, C.D., and E.F. were living there. C.D. testified that her grandfather's bedroom was upstairs, while Pouzar, C.D., and E.F. had bedrooms downstairs. C.D. testified that the sexual assaults always occurred in Pouzar's bedroom, at night. She also testified that the sexual assaults occurred over a span of several months, and that she frequently slept in Pouzar's room during that time frame.

¶3 In her interview, C.D. testified that the first time Pouzar sexually assaulted her, she "started telling him to stop," "crying," and "screaming," and he told her to "be quiet because there were other people in the house that were sleeping." On the first day of a three-day trial, C.D. was asked to clarify, as to the "times" that the sexual assaults occurred in Pouzar's room, "was it one time or

---

[1] The Honorable William E. Hanrahan presided over trial and entered the judgment of conviction. The Honorable Mario White entered the order denying the defendant's postconviction motion.

[2] To protect the identity of the victims, we refer to them as "A.B." and "C.D." *See* WIS. STAT. RULES 809.19(1)(g) and 809.86. For similar reasons, we refer to C.D.'s brother as E.F.

more than one time that you screamed?" C.D. testified in response, "Multiple times."

¶4 On the second day of trial, E.F. provided brief testimony for the defense. He testified that he lived at his grandfather's house with Pouzar and C.D. at the time of the alleged assaults. He also testified that his grandfather had a bedroom upstairs while E.F., Pouzar, and C.D. had bedrooms downstairs on the lower level.

¶5 At the start of the third day of trial and outside of the presence of the jury, the circuit court noted that, during E.F.'s testimony on the previous day, E.F. was lethargic and slow to respond, appeared somewhat confused, and had blood-shot, glassy eyes. The court also noted that E.F. suffered a seizure immediately following his testimony and that blood tests at the hospital indicated the presence of tetrahydrocannabinol (THC). Based on that information and a discussion with counsel, the court instructed the jury that E.F. had THC in his system when he testified and that he suffered a seizure after he finished testifying.

¶6 In closing, the prosecutor argued that C.D. was credible because she was able to provide details of the alleged sexual assaults, including that she "screamed" during the first assault that she described "so clearly." The jury found Pouzar guilty on all counts.

¶7 Pouzar filed a postconviction motion seeking a new trial in the interest of justice as to his two convictions related to C.D. because the real controversy was not fully tried. Pouzar asserted that the jury was prevented from hearing critical evidence bearing on C.D.'s testimony because E.F. was unable to fully testify at trial. He asserted that, after the trial, E.F. was diagnosed with a cyst

on his brain that likely caused his post-testimony seizure and that he was now on seizure medication.

¶8     At a postconviction motion hearing, E.F. testified consistently with his trial testimony that he lived at his grandfather's house with Pouzar and C.D. at the time of the alleged assaults of C.D.; that E.F.'s grandfather's room was on the upper level; and that E.F., Pouzar, and C.D. had rooms on the lower level.  E.F. also offered the following additional testimony.

¶9     E.F.'s room was directly next to C.D.'s room.  Their rooms shared a wall, and each of their beds was placed against the shared wall between their rooms.  Pouzar's room was directly across from E.F.'s.  Noise carried throughout the house, so that if E.F. was in his room, he could hear C.D. playing in her room or Pouzar watching television or talking on the phone in his room, even with his and Pouzar's doors closed.  E.F. was a very light sleeper at that time and would hear activities throughout the house during the night, such as his grandfather using the bathroom upstairs or Pouzar talking on the phone in his own room across the hall.  E.F. "never heard" C.D. in Pouzar's room, or Pouzar "stop at" C.D.'s room, during the night.

¶10    C.D. would wake up "screaming" with night terrors two or three times a week, and on those occasions she would knock on E.F.'s bedroom door and ask to sleep in his room.  E.F. would say no, but he would go and check C.D.'s room for her to make sure nothing was there.  Because E.F.'s and C.D.'s beds were against the same shared wall between their rooms, E.F. was able to tell that the "screaming" was coming from her room.  He could also hear her open the door to her own room before she knocked on his door.  E.F. never heard C.D.

"scream" from any other room in the lower level. If C.D. had ever "screamed" from Pouzar's room, E.F. would have been able to hear it.

¶11 The circuit court denied the postconviction motion. The court found that the State did not rely so heavily on C.D.'s specific testimony that she "screamed" during the assaults such that E.F.'s proffered testimony would cast doubt on the validity of the jury's verdict. Pouzar appeals.

¶12 Pouzar seeks a new trial in the interest of justice on grounds that the real controversy was not fully tried. *See* WIS. STAT. § 752.35 (2019-20).[3] "[T]he real controversy has not been tried if the jury was not given the opportunity to hear and examine evidence that bears on a significant issue in the case, even if this occurred because the evidence or testimony did not exist at the time of trial." *See State v. Maloney*, 2006 WI 15, ¶14 n.4, 288 Wis. 2d 551, 709 N.W.2d 436 (citing *State v. Hicks*, 202 Wis. 2d 150, 160-61, 549 N.W.2d 435 (1996)). We need not determine that a new trial would likely result in a different outcome. *State v. Watkins*, 2002 WI 101, ¶97, 255 Wis. 2d 265, 647 N.W.2d 244. However, "[t]he power to grant a new trial in the interest of justice is to be exercised 'infrequently and judiciously.'" *State v. Avery*, 2013 WI 13, ¶38, 345 Wis. 2d 407, 826 N.W.2d 60 (quoted source omitted).

¶13 Pouzar argues that the real controversy was not fully tried because E.F. was unable to fully testify, which deprived the jury of important evidence bearing on the credibility of C.D.'s testimony. Pouzar asserts that C.D.'s credibility was central to this case because C.D.'s testimony was the only evidence

---

[3] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

that Pouzar had sexually assaulted C.D. Pouzar points out that the details provided by C.D. included that C.D. regularly slept in Pouzar's room and that the sexual assaults always occurred there, and that as to the times that of the sexual assaults that occurred in Pouzar's room C.D. "screamed" "multiple times." Pouzar then points to E.F.'s proffered testimony that he was a very light sleeper; that his room shared a wall with C.D.'s room and that Pouzar's room was directly across from his; that sound carried between the rooms; that he could hear C.D. frequently wake up "screaming" in her own room, due to what E.F. said were night terrors, then open her own door and knock on E.F.'s door; and that he never heard C.D. or Pouzar in each other's rooms at night and never heard C.D. "scream" from Pouzar's room. Pouzar asserts that E.F.'s testimony would have directly contradicted the details C.D. provided about the alleged sexual assaults, and that it was competent and persuasive evidence that the jury never heard. *See State v. Harp*, 161 Wis. 2d 773, 778, 469 N.W.2d 210 (1991) (new trial may be warranted where "competent and persuasive evidence [] was not introduced into evidence" (quoted source omitted)). He argues that, without E.F.'s testimony, the important issue of the credibility of C.D.'s accusations was not fully tried.

¶14    Pouzar argues that this is an exceptional case akin to other cases in which the supreme court has granted new trials in the interest of justice because the real controversy was not fully tried. Pouzar analogizes this case to *Hicks*, 202 Wis. 2d 150, and *Garcia v. State*, 73 Wis. 2d 651, 245 N.W.2d 654 (1976), in which our supreme court granted new trials when important evidence was not introduced.

¶15    In *Hicks*, 202 Wis. 2d 150, the supreme court granted a new trial in the interest of justice because DNA evidence would have excluded Hicks as a DNA match for a hair specimen on which the State heavily relied to identify Hicks

6

as the perpetrator of a sexual assault. The court explained that it "must have the liberty … to consider the totality of circumstances and determine whether a new trial is required to accomplish the ends of justice because the real controversy has not been fully tried." *Id.* at 160. It concluded that a new trial in the interest of justice was warranted because "the jury did not hear important DNA evidence that bore on an important issue of the case," and "the testimony the jury heard with respect to the hair as affirmative proof of guilt was inconsistent with what the later DNA analysis revealed, thus clouding the crucial issue of identification." *Id.* at 161.

¶16      The court in *Hicks* explained that, "The sole issue in the present case is identification:  whether Hicks was the man [who] entered [the victim's] apartment and assaulted her." *Id.* at 163. The court stated that the jury that found Hicks guilty "did not have an opportunity to hear and evaluate evidence of DNA testing which excluded Hicks as the source of one of the four pubic hairs found at the scene," but rather "was presented with evidence and argument that was later found inconsistent with the facts." *Id.* Because the prosecutor argued at trial that the hair evidence supported the State's case, and "the remaining physical and scientific evidence was inconclusive, the DNA test result could have been a crucial, material piece of evidence." *Id.* at 163-64. However, the jury "was not given the opportunity to hear relevant exculpatory DNA evidence that went directly to the issue of identification … not because of an erroneous ruling, but because" the DNA evidence did not yet exist. *Id.* at 164.

¶17      The court in *Hicks* stated further that, "[b]y itself, the fact that Hicks obtained post-conviction DNA evidence might not persuade [the court] to remand … for a new trial in the interest of justice." *Id.* at 164. It explained that "[t]he determinative factor in the present case is the fact that the State assertively and

7

repetitively used hair evidence throughout the course of the trial as affirmative proof of Hicks' guilt." *Id.* It was "[t]he combination of these two factors" that persuaded the court that the real controversy was not fully tried. *Id.*

¶18 In *Garcia*, 73 Wis. 2d at 655, "[t]he major facts in dispute at the trial were the identification of the defendant [as the shooter] and his alibi that he was not there." The supreme court granted a new trial in the interest of justice because "all of the material evidence as to th[ose] issues was not presented to the jury." *Id.* The court explained that the proffered evidence—"[t]he testimony of a confessed participant to the shooting … to the effect that the defendant [] Garcia was not there and in no way participated"—was "very material and significant." *Id.* The court acknowledged that "the defendant in a cavalier and misguided concept to protect his friend did not disclose this evidence," until after his conviction, but determined that this fact did "not go to the matter of whether the controversy was fully tried and whether he was, in fact, guilty." *Id.* The court called it "a close case," but concluded that "the integrity of our system of administration of criminal justice should afford a jury the opportunity to hear and evaluate the evidence of the participant" who would testify that Garcia was not involved. *Id.* at 655-56.

¶19 In his reply brief, Pouzar also cites *State v. Armstrong*, 2005 WI 119, ¶154, 283 Wis. 2d 639, 700 N.W.2d 98, in which our supreme court ordered a new trial in the interest of justice because new DNA evidence undermined the evidence that the State relied on to argue "that the physical evidence conclusively and irrevocably established Armstrong as the murderer." Pouzar argues that, in both *Hicks* and *Armstrong*, the supreme court ordered new trials because the evidence was important to the juries' full consideration of guilt or innocence.

¶20 Pouzar argues that the same is true here. Specifically, he argues that the jury did not have the opportunity to hear E.F.'s testimony contradicting the details C.D. provided as to the alleged sexual assaults. He argues that, because the case depended on C.D.'s credibility and E.F.'s testimony went to the credibility of her allegations, the real controversy was not fully tried.

¶21 We conclude that this is not an exceptional case that warrants a new trial in the interest of justice. Unlike in *Hicks*, *Garcia*, and *Armstrong*, the proffered evidence does not directly contradict any of the State's evidence at trial. E.F.'s proffered testimony was intended to contradict C.D.'s assertions that, over a span of several months, she regularly slept in Pouzar's bedroom and that she "screamed" from Pouzar's bedroom at night. However, as the State points out, E.F. admitted that there were times at night that he would have been sleeping and that he did not always know where C.D. was sleeping. Thus, E.F.'s testimony would not have directly contradicted C.D.'s testimony that she regularly slept in Pouzar's room during the months at issue and "screamed" "multiple times," including the first time that Pouzar sexually assaulted her in his room at night.

¶22 Additionally, unlike the DNA evidence in *Hicks* and *Armstrong*, E.F.'s testimony would not challenge evidence that the State heavily relied on as affirmative evidence of Pouzar's guilt. It is true, as Pouzar asserts, that the State's theory was that C.D. credibly testified as to the details of the sexual assaults and that the State reminded the jury in closing that one such detail was C.D.'s testimony that she "screamed" during the first assault. However, the State mentioned C.D.'s "screaming" merely as an example of how clearly she remembered the first assault. In addition, C.D.'s short answer during her trial testimony that she "screamed" "multiple times" was ambiguous as to how often, how loudly, or in what manner she "screamed" on any occasion. This included

her testimony that, when Pouzar sexually assaulted her the first time, she was "screaming" and "crying" and Pouzar told her to be quiet. Moreover, C.D. provided numerous other details as to the sexual assaults that the jury considered in weighing her credibility, and the other victim, A.B., testified to substantially similar abuse by Pouzar when she was around the same age as C.D.[4] In light of the totality of the circumstances in this case, we are not persuaded that E.F.'s proffered testimony was necessary for the real controversy to be fully tried.[5] We affirm.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

---

[4] Pouzar asserts that we should not consider A.B.'s testimony in considering whether to grant a new trial in the interest of justice because a fact finder is required to consider two or more charges separately. *See Peters v. State*, 70 Wis. 2d 22, 32, 233 N.W.2d 420 (1975). However, when considering whether to grant a new trial in the interest of justice, we consider the totality of the circumstances. *See State v. Hicks*, 202 Wis. 2d 150, 160, 549 N.W.2d 435 (1996). Here, the totality of the circumstances includes the corroborating testimony by A.B. at trial.

[5] Pouzar also asserts that his due process rights were violated because the real controversy was not fully tried. Because we conclude that the real controversy was fully tried, we also conclude that Pouzar's due process rights were not violated.